IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC., THE ASSOCIATED PRESS, CABLE NEWS NETWORK, INC., CBS BROADCASTING INC., FOX NEWS NETWORK, L.L.C. and NBC UNIVERSAL, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>NINA MITCHELL WELLS, in her official capacity as the SECRETARY OF STATE OF THE STATE OF NEW JERSEY and ANNE MILGRAM, in her official capacity as the ATTORNEY GENERAL OF THE STATE OF NEW JERSEY,<br><br>Defendants. | Civil Action No. 09-5275 (PGS)<br><br><br>OPINION |

This motion comes before the Court on an Order to Show Cause by plaintiffs, ABC, Inc. ("ABC"), The Associated Press, Cable News Network, Inc. ("CNN"), CBS Broadcasting Inc. (CBS), Fox News Network, LLC ("Fox News") and NBC Universal, Inc. ("NBC") (collectively "Plaintiffs") seeking a preliminary injunction. By way of preliminary injunction Plaintiffs request that the Court permit Plaintiffs to conduct exit polling within 100 feet of approximately forty (40) voting precincts in New Jersey on Election day, November 3, 2009, which has been barred by a New Jersey Supreme Court decision. *See In Re: Attorney General's "Directive of Exit Polling: Media and Non-partisan Public Interest Groups"*, 2009 WL 3260603 (N.J. Sept. 30, 2009). It is undisputed that the New

1

Jersey Gubernatorial Election is a newsworthy event and plaintiffs are engaged in reporting news.

## STATEMENT OF FACTS

Overview of Exit Polling

For about twenty years Plaintiffs have jointly conducted exit poll interviews within 100 feet of polling places throughout the United States, including New Jersey in gubernatorial elections. Plaintiffs provide a summary of the mechanics, purpose, and uses of exit poll data. An "exit poll" refers to the collection of data from a random sample of voters on election day but with criteria that satisfies polling experts.[1] Voters are approached after they leave the polling place. According to Plaintiffs, this is done in a scientifically pre-determined pattern, for example interviewing every fourth voter. The voters are requested to fill out anonymous surveys. Plaintiffs send one pollster to each location and they are instructed to stand as close as 25 feet to the entrance of the voting facility. Pollsters wear badges clearly identifying the news organizations for which they work.

Voters are surveyed on how they voted, why they voted, and to submit their opinions on issues of political importance. No personal information is required. Voters are also asked demographic information. Once completed the voter places the questionnaire in a closed box; Plaintiffs contend that the confidentiality of all voters are strictly maintained.

---

[1] Plaintiffs submit an Affidavit of Joseph W. Lenski, the Executive Vice President of Edison Research, a national polling organization. Mr. Lenksi has been involved with the process and conduct governing exit polls for the last 40 years. Defendants in opposition submit a certification of Katherine Hempstead. Ms. Hempstead is the director of the center for health statistics in the N.J. Department of Health. She admits in her sworn certification that she is "not an expert in survey methodology/public opinion polling." Because Ms. Hempstead is not an expert in exit polling her certification will be given little weight.

Plaintiffs use exit poll information to analyze voters' attitudes, issues of public concern, and how voting is progressing for individual candidates. The information is streamlined to news broadcasters and analysts that report on the election. The data also allows the Plaintiffs to project the outcome of the election contests. Additionally, the information is archived, and then accessed by a wide range of academics, researchers, and analysts to determine voting trends and other electoral issues. Plaintiffs argue that exit polling has became a vital part of the election process and is "critical to confirming the accuracy of election results and in establishing electoral credibility." (Lenski Aff. ¶ 36.)

The November 3, 2009 Election

New Jersey's gubernatorial election is on November 3, 2009. New Jersey's election is only one of two gubernatorial elections taking place in the nation this year, and Plaintiffs plan on providing comprehensive coverage of the election. In anticipation of the election, Plaintiffs have retained Edison Media Research of Somerville, New Jersey ("Edison Research") to conduct exit polls of voters at forty (40) selected election precincts in New Jersey. Plaintiffs argue that in all the years they have done exit polls, they have never received any complaints from Defendants or other election officials.

Plaintiffs argue that their ability to provide accurate reporting on the election will be severely impaired if Defendants prohibit exit polling within 100 feet of polling places. Plaintiffs provide several reasons for why the exit polls are less accurate the farther away from the polling place the reporter is forced to stand: (1) the reporter will not be able to approach a voter before the voter reaches his car or walks away; (2) it becomes more difficult to determine who is a voter; (3) there

is less statistical reliability in the data because it is impossible to follow a pre-determined scientific pattern.

Mr. Lenski's Affidavit provides compelling evidence that the distance restriction of 100 feet will severely impact the media's ability to report the news. Since learning of the distance restriction, Mr. Lenski conducted several studies to evaluate its effect. At about half of the forty locations where exit polling is to be conducted the exit poll reporters cannot reach the majority of voters. (Lenksi Aff. ¶¶ 28-29.) In urban areas, the situation is worse the exit pollsters would not be able to identify a voter because the individual would disperse into a crowd on the sidewalk or street. (*Id.*) In sixteen locations the studies determined that it would be impossible to find a reasonable location within 100 feet because there were multiple exits, and it was not clear where a reasonable position could be established. In the end, the study found that only nine locations might allow voters to reach the exit pollsters, and even in those locations the study determined that exit polling would be restricted. (*Id.* ¶ 30.)

Moreover, Mr. Lenski presents a statistical survey of archived data from nationwide exit polling in 2004 and 2006 that occurred in jurisdictions that required a 100-foot distance restriction. In those polls, there was a demonstrated statistical error twice the error rates in other districts. Mr. Lenski's conclusion is that there is no reliable alternative to exit polls for gathering information concerning election day behavior. (*Id.* ¶ 34.)

## DISCUSSION

### I. Standard for Preliminary Injunction

The standard for a preliminary injunction requires the plaintiff to establish the following four

elements: 1) the plaintiff is likely to succeed on the merits; 2) denying the injunction will result in irreparable harm to the plaintiff; 3) granting the injunction will not result in greater harm to the defendant; and 4) the injunction is in the public interest. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002). Courts have noted that a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948, at 129-130 (2d ed. 1995)). Additionally, the Supreme Court has held that "[a] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Winter v. NRDC, Inc.*, 129 S. Ct. 365, 375 (U.S. 2008). Furthermore, a preliminary injunction may not be issued where there are disputed issues of fact. *Gruntal & Co. v. Steinberg*, 843 F. Supp. 1, 15 (D.N.J. 1994). It is important to keep this high standard in mind in the analysis of each element of the test for granting an injunction.

The Court must evaluate these four factors to determine if a preliminary injunction should be issued.

## II. Likelihood of Success on the Merits.

<u>Exit Polling is Protected Speech Under the First Amendment</u>

The U.S. Supreme Court held that "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political

processes." *Mills v. Alabama*, 384 U.S. 214, 219 (1966).

The First Amendment protects the media's right to gather news. *See, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980); *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("Without some protection for seeking out the news, freedom of the press could be eviscerated."). The freedom to the report the news retains great stature in our nation's First Amendment jurisprudence. Additionally, exit-polling is protected speech under the First Amendment. *The Daily Herald Co. v. Munro*, 838 F.2d 380, 384 (9th Cir. 1988). There is no doubt that the "ability to speak on matters of public importance is fundamental to self-government." *CBS Inc. v. Smith*, 681 F. Supp. 794, 803 (S.D. Fl. 1988).

A constitutional review of a state regulation governing speech will depend on whether the speech occurs in a traditional public forum, and then subsequently whether the statute is content-based or content-neutral. The *Daily Herald* court held that "public areas within 300 feet of entrance to polling places are traditional public forums because they traditionally are open to the public for expressive purposes, including random interviews by reporters..." 838 F.2d at 384-85 (citing *Perry Ed. Assoc. v. Perry Local Educators' Assoc.*, 460 U.S. 37, 45 (1983).

A content-based statute that restricts speech in a public forum must be narrowly tailored to accomplishing a compelling government interest and it must be the least restrictive means available. *See Consolidated Edison Co. v. Pub. Serv. Comm. of N. Y.*, 447 U.S. 530, 540 (1980); *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 800 (1985). The court in *Daily Herald* concluded that a similar statute expressly banning exit polling from the polling places was deemed to be a content-specific regulation. The court applied the strict scrutiny analysis above and

determined that the statute was not narrowly tailored to any compelling governmental interest. The court held, "[t]he state argues that the statute's purpose is to prevent disruption at the polling place, but the statute prohibits all exit polling, including nondisruptive exit polling. Prohibiting nondisruptive exit polling therefore does not advance the state's interest and also renders the statute over broad because it applies to activities not implicating the interest." 838 F.2d at 385.

The *Daily Herald* court additionally held that even if the statute was considered to be content-neutral it would fail to pass constitutional muster. A content-neutral statute will be struck down if it is "not a reasonable time, place, and manner regulation, narrowly tailored to serve a significant government interest and leaving open ample alternative channels of communication." *Id.* at 386 (citing *Consol. Edison Co.*, 447 U.S. at 535-56). While courts are generally less concerned about statutes that are content-neutral, in this case the government interest fails under either test as it relates to prohibiting exit polling. Moreover, the affidavit submitted by Plaintiffs demonstrate that there does not exist any alternative channel to gather this information. *See id.* Therefore, the inquiry as to whether the statute is content-specific or content-neutral is not determinative, as under either inquiry the statute is not narrowly tailored to significant or compelling government interests.

Additionally, to the Court's knowledge every federal court to have addressed exit polling has struck down state efforts restricting the news organizations' rights to conduct exit polls outside of 100 feet. In every case, the impetus by the state is to protect the integrity of the polling place and to prevent election fraud and intimidation to voters. There is no evidence on the record that exit pollsters have ever been engaged in such activity. Even more persuasive is the fact that the exit polling takes place *after* individuals vote. Voters are not approached entering polling places–and

it is conduct affecting voters on their way to the polls that the government may have an interest in protecting.

<u>The New Jersey Supreme Court's Ruling on Exit Polling</u>

Defendants rely on a recent New Jersey Supreme Court decision, *In Re: Attorney General's "Directive of Exit Polling: Media and Non-partisan Public Interest Groups"* ("*Exit Polling*"), 2009 WL 3260603 (N.J. Sept. 30, 2009), which ultimately held that New Jersey's election laws prohibit any and all expressive activity within 100 feet of New Jersey polling places. The Plaintiffs in this case were not parties to the *Exit Polling* case. In *Exit Polling*, the American Civil Liberties Union ("ACLU") challenged a 2007 Attorney General Directive that denied the ACLU's request to distribute "voting-rights" cards within 100 feet of a polling place. The *Exit Polling* court determined that the true issue before the court was "whether *all* expressive activities– electioneering and non-electioneering –are banned within 100 feet of a polling place under New Jersey's election laws and, if so, whether such a ban, as it applies to exit polling and the distribution of voting-rights cards, conforms to the First Amendment of the United States Constitution." *Exit Polling*, 2009 WL 3260603 at *1. The Court held that New Jersey's election laws banned all expressive activity within 100 feet and did not violate the First Amendment because it was a content-neutral restriction that was reasonable as to time, place, and manner. According to the New Jersey Supreme Court, the state intended to secure the vital constitutional right to vote. This conclusion as to exit polling is misplaced. It is not an activity related to the government's interest in securing the right to vote.

Plaintiffs persuasively argue that because they were not parties to that action, the New Jersey Supreme Court could not have adequately addressed the concerns of the media to report the news

under the First Amendment. That court would not have been privy to the documents presented to this Court concerning the nondisruptive nature of exit polling and the substantial political, social, and educational benefits that arise from exit polling.

The New Jersey Supreme Court relies on the Supreme Court's decision in *Burson v. Freeman* to uphold the state statute. However, *Burson* dealt with a state's interest in prohibiting electioneering at the entrance to polling places. *See CBS Broadcasting, Inc., et al. v. Cobb*, 470 F. Supp. 2d 1365, 1370 (S.D. Fl. 2006) ("[In *Burson*], the goal was to protect the voter against inappropriate 'electioneering' as the voter was entering the polling station. Exit polling does not implicate the same voting-integrity concerns as electioneering.") Not only does the issue concern electioneering, but the Court specifically addressed the possibility that statutes could impermissibly affect other types of speech as well. The Court states:

> In fact, as one early commentator pointed out, allowing members of the general public access to the polling place makes it more difficult for political machines to buy off all the monitors. But regardless of the need for such additional monitoring, there is, as summarized above, ample evidence that political candidates have used campaign workers to commit voter intimidate or electoral fraud. *In contrast, there is simply no evidence that political candidates have used other forms of solicitation or exit polling to commit such electoral abuses* . . . The First Amendment does not require States to regulate for problems that do not exist.

*Burson*, 504 U.S. at 207 (emphasis added). Thus, the U.S. Supreme Court upheld a statute that prohibited electioneering within 100 feet because of a long history of intimidation and fraud at the polls but allowed exit polling. The U.S. Supreme Court engages in an in-depth historical analysis of the corrupt practices that have occurred at elections in American history. The *Burson* Court summed up the historical analysis as revealing a "persistent battle against two evils: voter

intimidation and election fraud." *Id.* at 206. In *Burson*, the historical record is directly relevant to whether the statute is narrowly tailored to a compelling state interest. In *Exit Polling* the analysis misses the mark.

While no one disputes that voter intimidation and fraud are compelling government interests, there is no historical evidence that the concern is addressed in any way by prohibiting exit polling by the Plaintiffs. Exit polling occurs after voters leave the polls, the surveys are conducted in a nondisruptive manner, and are entirely voluntary. The concern in *Burson* was for voters *entering* the polls. *Id.* at 210 ("The State of Tennessee had decided that these last 15 seconds before its citizens *enter* the polling place should be their own . . .") (emphasis added); *accord ABC Inc. et al. v. Blackwell*, 479 F. Supp. 2d 719 (S.D. Ohio 2006) ("By definition, exit polling affects only those who have already voted"); *Cobb*, 470 F. Supp. 2d at 1370 ("Exit polling has not been show to interfere with 'the act of voting itself.' Indeed, the very nature of exit polling is that it will take place only after a citizen has voted.").

The exit poll proposed by Plaintiffs is much narrower than *Exit Polling* contemplates:

(a) Exit polling by plaintiffs news agencies has not disrupted any voters in the last twenty years;

(b) the Plaintiffs, news agencies, shall oversee, supervise, and train all pollsters;

(c) the exit polling plan is very narrow in that it effects only forty (40) voting precincts out of 3200–slightly more than one percent;

(d) none of the exit polling will occur until after the person has voted; and

(e) the exit poll will be overseen by an expert in the field to minimize disruptions.

### III. Irreparable Harm.

It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiffs have clearly established irreparable harm. There are no alternative means to gather this information, which is vital to reporting election news. If they are not permitted to conduct exit polling within 100 feet of the polling places then the information gathered will be unreliable. Additionally, they would not be able to adequately report the news to the public.

### IV. Harm to the Defendants.

The Defendants will not be harmed. Plaintiffs have conducted exit polls in this state since at least 1988. There is no evidence that exit polling has every created a disturbance at the polling place. The Court agrees that the State always has a compelling interest in preventing intimidation and electoral fraud. However, those interests are not implicated by allowing non-disruptive exit polls to take place after the citizen has voted. The State has never been concerned of exit polling activity. Additionally, Plaintiffs are conducting exit polls at only 40 voting precincts out of an approximate 3200 voting districts. They have represented to the Court that only one pollster will be present and that they will abide by Defendants' regulations concerning safety and order at the voting precincts. Plaintiffs admit they are responsible for the actions of their pollsters and that their pollsters are trained to be non-disruptive and courteous. The Court's ruling is narrowly drawn to apply to the plaintiff news organizations alone.

### V. The Injunction is in the Public Interest.

At first blush, it appears that the Court must balance the interests in the public's fundamental

right to debate public issues and the press's first amendment right to gather news against the fundamental right of the public to cast their votes free of intimidation and fraud. The press has a significant interest in reporting the news to the public. At the same time the greatest danger to the right to vote is that the election should be corrupt because of fear or intimidation. However, the Court finds that both these public interests are served in granting the preliminary injunction.

As the *Burson* court suggested, and other courts have agreed, the "presence of the press at polling places would likely serve as a deterrent to fraud and intimidation." *Blackwell*, 479 F. Supp. at 738 (S.D. Ohio 2006). Thus, while in certain situations, such as *Burson*, the Court has held that the First Amendment must fall to a compelling government interest to prevent inappropriate electioneering conduct that is proven to lead to intimidation and fraud, the same analysis provides that the Plaintiffs' rights under the First Amendment to conduct exit polls protects the integrity of the polling places by providing a transparent and non-disruptive access to the media. There is simply no evidence that exit-polling has ever led to disorderly conduct at polling places. Thus, the public interest weighs in favor of granting the injunction.

## CONCLUSION

Plaintiffs preliminary injunction is granted. Plaintiffs are reputable and established news organizations and under First Amendment law they have a protected interest in reporting the news to the public.

October 23 2009

PETER G. SHERIDAN, U.S.D.J.